AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | FILED<br>CLERK, U.S. DISTRICT COURT<br><br>10/12/2021<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: *Velecia Weave* DEPUTY |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | |
| | ) Case No.   2:21-mj-04697 | |
| THE PREMISES LOCATED AT 13205 MIRA MAR DR. SYLMAR, CALIFORNIA 91342 | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |
| 21 U.S.C. § 922(a)(3) | Illegal Shipment/Transportation of Firearms |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Jannah R. Holden*
_____
*Applicant's signature*

*Jannah R. Holden, ATF Special Agent*
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   10/12/21
_____
*Judge's signature*

City and state: Los Angeles, CA          Hon. Charles F. Eick, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Rachel N. Agress (x0487)

<u>**ATTACHMENT A-1**</u>

<u>PREMISES TO BE SEARCHED</u>

The SUBJECT PREMISES located at 13205 Mira Mar Dr. Sylmar, CA 91342 is a two story, single family residence located on the west side of Mira Mar Drive, in a gated community.  The SUBJECT PREMISES is white in color with brown trim and maroon color clay roofing tiles.  The driveway is paved concrete and leads to a two-car garage with just enough space in the driveway to park two vehicles.  A white plaque with brown numbers reading "13205" is located at the top righthand corner of the garage door. A palm tree roughly seven feet in height is located just underneath the plaque, also to the righthand side of the garage door.  A concrete paved walkway leads from the driveway on the righthand side of the garage door around the north side of the garage to the front door of the SUBJECT PREMISES.  The front door is facing the north and tucked away in a covered porch underneath the second story of the SUBJECT PREMISES.  Just to the right of the front door is a window facing the toward the east.  The front yard of the SUBJECT PREMISES has no fence, however there is a wooden fence on the side of the SUBJECT PREMISES separating the front yard from the back yard.

The area to be searched at the SUBJECT PREMISES includes all rooms, annexes, attics, basements, porches, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers, locked containers and safes, cabinets, rooms, parked vehicles, sheds, and outbuildings associated with the SUBJECT PREMISES and shall extend into

desks, cabinets, safes, briefcases, backpacks, wallets, purses, trash receptacles, digital devices, and any other storage locations within the SUBJECT PREMISES.







**ATTACHMENT B**

## I. ITEMS TO BE SEIZED

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm), and 18 U.S.C. § 922(a)(3) (Illegal Shipment/ Transportation of Firearms) (collectively, the "Subject Offenses"), namely:

      a.      Firearms or ammunition;

      b.      Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

      c.      Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

      d.      Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

e.      Records, documents, programs, applications, materials, or conversations relating to the sale or purchase of guns or ammunition, including correspondence, receipts, records, and documents noting prices or times when guns or ammunition were bought, sold, or otherwise distributed;

f.      Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of guns or ammunition;

g.      Contents of any calendar or date book;

h.      Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

i.      Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

j.      With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.      evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.      evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as

ii

well as evidence of the presence or absence of security software
designed to detect malicious software;

      iii.   evidence of the attachment of other devices;

      iv.   evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

      v.    evidence of the times the device was used;

      vi.   passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

      vii.  applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to conduct
a forensic examination of it;

      viii. records of or information about Internet
Protocol addresses used by the device;

      ix.   records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages, search
terms that the user entered into any Internet search engine, and
records of user-typed web addresses.

63.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

64.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

65.  In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

66.  Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

67.  The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.  The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

68.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

69.  If the search determines that a digital device does not contain any data falling within the list of items to be

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

70. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

71. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

72. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

73. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

74. In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

75.  The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

76.  During the execution of this search warrant, law enforcement is permitted to: (1) depress Quentin CANTRELL ("CANTRELL")'s thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of CANTRELL's face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

77.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Jannah R Holden, being duly sworn, declare and state as follows:

## PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of applications for warrants to search the following property and person described more fully in Attachments A-1, A-2, A-3, and A-4, which there is probable cause to believe are currently located in the Central District of California:

a.    The house located at 13205 Mira Mar Dr. Sylmar, CA 91342, in Los Angeles County, in the Central District of California (the "SUBJECT PREMISES"), currently rented by an individual CANTRELL is believed to be in a relationship with, and where, as discussed below, based on surveillance, CANTRELL is believed to currently reside, as further described in Attachment A-1;

b.    A cellular telephone issued by Verizon Wireless with phone number (747) 242-4625 (the "SUBJECT TELEPHONE"), and registered to a "Quentin Cantrell" with a subscriber address of "8200 Owensmouth Ave., Apt 1, Canoga Park, CA," and believed to be used by CANTRELL, as further described in Attachment A-2;

c.    A black Cadillac, XTS, sedan vehicle bearing California license plate 8VBC017, vehicle identification number 2G61M5S33K9115264 (the "SUBJECT VEHICLE"), as further described in Attachment A-3;

d.    The person of Quentin CANTRELL, as further described in Attachment A-4.

2.    The requested search warrants seek authorization to
seize evidence, fruits, and instrumentalities of violations of
Title 18, United States Code, Section § 922(g)(1) (Felon in
Possession of a Firearm) and Section 922(a)(3) (Illegal
Shipment/Transportation of Firearms) (the "Subject Offenses").

3.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested search warrants
and does not purport to set forth all of my knowledge of or
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

## BACKGROUND OF AFFIANT

4.    I am a Special Agent with the Bureau of Alcohol,
Tobacco and Firearms ("ATF") and have been so employed since
September 2020.  Prior to becoming a Special Agent with ATF, I
served as a Special Agent with the Naval Criminal Investigative
Service ("NCIS") for approximately three years.  I am currently
assigned to the ATF Los Angeles Division, Glendale V Field
Office, in Glendale, California.  I received a Bachelor of
Science degree in Criminal Justice from Old Dominion University
in Norfolk, Virginia and a Master of Science Degree in
Criminology from Boston University in Boston, Massachusetts.  I
served in the United States Navy and honorably separated in 2004
at the rank of Petty Officer Second Class.  I thereafter worked

2

for seven years with the Federal Bureau of Investigations
("FBI") in Norfolk, Virginia and Los Angeles, California.

5.    I am a graduate of the ATF's Special Agent Basic
Training and from the Department of Homeland Security's Criminal
Investigator Training Program.  I received training and have
experience in the trafficking of firearms and controlled
substances, including but not limited to the identification of
controlled substances and the use of coded language, arson, and
explosives.  I have participated in dozens of investigations
involving the illegal sales, transfer, and possession of
firearms and controlled substances and interviewed defendants,
informants, and witnesses with first-hand knowledge of methods
for trafficking the same.  Additionally, I participated in many
aspects of firearms and gang investigations, including
conducting surveillance and the use of confidential informants
and undercover ("UC") agents to make controlled purchases of
controlled substances and/or firearms.

### SUMMARY OF PROBABLE CAUSE

6.    Between in or around January 2021 and July 2021,
CANTRELL arranged for an individual with whom he had a pre-
existing relationship and who resides in Ohio, the Confidential
Source ("CS"),[1] to purchase approximately sixteen firearms at

---

[1] The CS began working with the ATF in connection with this
federal investigation in August 2021 and has not been
charged.  Although the CS has never provided information to law
enforcement prior to this investigation, the CS has provided
information in this investigation that is against his/her penal
interest and that has been corroborated and proven to be
*(footnote cont'd on next page)*

CANTRELL's direction and on his behalf.  CANTRELL resides in the
Central District of California but flew to Ohio in connection
with certain of the firearm purchases.  CANTRELL instructed the
CS regarding which firearms to purchase and for what price via
text messages and phone calls from the SUBJECT TELEPHONE using
the phone number (747) 242-4625.  In addition, on at least two
occasions, CANTRELL accompanied the CS to a gun store.  Upon the
request of CANTRELL, the CS typically fronted money to purchase
the firearms and CANTRELL reimbursed the CS afterwards.
CANTRELL told the CS that he sold firearms for profit.  On one
occasion in or about January 2021, CANTRELL shipped firearms to
the Los Angeles area, with the CS assisting him.  On other
occasions, the CS shipped packages suspected to contain firearms
to an address provided by CANTRELL, which is the SUBJECT
PREMISES.

     7.   The SUBJECT PREMISES is the location where CANTRELL
lives, based on GPS records from August and September 2021 and
law enforcement surveillance of the residence in September and
October 2021.

     8.   CANTRELL informed the CS that he drove the SUBJECT
VEHICLE and provided the CS with a photograph, but told the CS
that the SUBJECT VEHICLE was in a car accident.  Based on law
enforcement surveillance of the SUBJECT PREMISES, CANTRELL was
driving a rental vehicle temporarily for a period of time, but

---

accurate.  The CS does not have a felony record or any
convictions for crimes of dishonesty.

has since resumed using the SUBJECT VEHICLE as of late August
2021.

<b><u>STATEMENT OF PROBABLE CAUSE</u></b>

9.    Based on my knowledge of and participation in the ATF
investigations described below, my conversations with other
agents and law enforcement officials, an interview performed of
the CS on September 30, 2021 and other conversations with the
CS, my review of law enforcement reports, videos and screenshots
of store surveillance footage, receipts of firearm purchases by
the CS and ATF forms completed by the CS in connection with
those purchases, preserved text messages between the CS and
CANTRELL, preserved records of CashApp transactions between the
CS and CANTRELL, certain of CANTRELL's certified conviction
records and preserved records relating to shipments made by the
CS and CANTRELL from Ohio to California, the CS's bank records,
and my training and experience, I know the following facts:

    A.    <u>Relationship between the CS and CANTRELL</u>

10.    According to information provided by the CS and based
on ATF Form 4473s filled out and signed by the CS and sales
receipts, between on or about January 22, 2021 and July 21,
2021, the CS purchased approximately sixteen firearms from three
different Federal Firearms Licensees ("FFLs") on behalf of and
at the direction of an individual named ""Quentin Cardell,"
later identified as CANTRELL.  The firearms were purchased in
the CS's name.  Typically, the CS used his/her debit card to
make the firearm purchases and CANTRELL would subsequently pay
the CS in cash or by using CashApp.  One additional firearm was

5

gifted from the CS to CANTRELL.  The CS also told law
enforcement that CANTRELL already had a "hefty gun collection."

11.   The CS had a personal relationship with CANTRELL
dating back to approximately 2018, predating the purchase of
firearms on CANTRELL's behalf.  The CS and CANTRELL spoke
frequently speaking on the phone (once or twice a week), and
CANTRELL would sometimes stay at the CS's house when he came to
visit Ohio from California.  According to the CS, in connection
with the purchase of firearms, he/she was only reimbursed for
expenses, and he/she was not paid additional compensation for
his/her role in the purchase of the firearms.  The CS has
stated, and contemporaneous communications reflect, that
CANTRELL sometimes paid for things on the CS's behalf.

12.   The CS said he/she began buying firearms in January of
2021 for CANTRELL after CANTRELL said, "hey let's go look at
guns."  The CS knew that CANTRELL was previously incarcerated
because CANTRELL told the CS about a prior "robbery" conviction.
Knowing this, the CS still agreed to purchase firearms for
CANTRELL.

13.   The CS provided law enforcement with the cellular
telephone number that CS used to communicate with CANTRELL about
firearms purchases, including directing the CS to look for
specific firearms and pricing, as well as regarding CANTRELL's
travel from California to Ohio.  CANTRELL communicated on the
SUBJECT TELEPHONE using both text messages and phone calls,
including regarding the purchase and shipment of firearms for
CANTRELL.  The CS provided law enforcement with historical text

messages with CANTRELL that the CS preserved, including text messages relating to firearm purchases made by the CS on CANTRELL's behalf.

14.  The CS also provided CANTRELL'S username on CashApp, and preserved records regarding payments made by CANTRELL to the CS on CashApp, and also provided CANTRELL's month and day of birth, and approximate age.

B.  January 2021 Purchases in Ohio and Shipment to California

15.  Prior to the first firearm purchase on behalf of CANTRELL (a "straw purchase") in January of 2021, CANTRELL flew to Ohio from California and was in contact with the CS. Specifically, on January 15, 2021, between 10:40 p.m. and 10:59 p.m., CANTRELL texted the CS from the SUBJECT TELEPHONE "I just landed", the CS replied "I'm sitting outside.  A white Acadia", and CANTRELL replied, "just waiting on my bag."

16.  The CS reported that at some point in January, while the CS was in a gun store looking at firearms on display to purchase on behalf of CANTRELL, CANTRELL, using the SUBJECT TELEPHONE, spoke with the CS to give the CS instructions, because the CS "didn't know what to pick out" (referring to firearms).

17.  On January 16, 2021, between 12:57 p.m. and 2:09 p.m., CANTRELL texted the CS from the SUBJECT TELEPHONE about potential firearms to purchase.  Specifically, CANTRELL sent the CS a link to a "Taurus G3c 9mm" on Gun Monkey Supply LLC's website.  The CS replied that the firearm was gone and asked

CANTRELL to "look at the website and let me know. I'm standing here" and that "used one are not on the website they are just in the store."  CANTRELL texted back "In store cool how much. . . Send pictures."  The CS replied, "he only has the one right now."  CANTRELL then responded, "Ok where are you," "hurry up," and "Hey come on back."

18.  At approximately 2:25 p.m. to 2:45 p.m., CANTRELL texted the CS from the SUBJECT TELEPHONE and sent multiple images as well as a link to a "Taurus G2C 1" on Call Sign Alpha LLC's website.  The CS texted back several images and "332 about."  Based on my training and experience, I believe that this refers to an approximate purchase price of about 332 for a firearm that was being considered.

19.  At 5:22 p.m., CANTRELL texted the CS six images from the SUBJECT TELEPHONE and sent the following message: "Call that shop ask about mini draco."  Based on my training and experience, a "mini draco" is a commonly sold 7.62X39 caliber pistol that looks like an AK47-style rifle, but shorter in

length.  Two of the screenshots exchanged on January 16, 2021
were the following images:



20.   The next day, on January 17, 2021, at 10:07 p.m.,
CANTRELL texted a link to "ARMSLIST - Ohio Firearms Classifieds"
from the SUBJECT TELEPHONE.

21.   The CS texted CANTRELL "just handguns, right?" and
CANTRELL replied "Yes and mini draco."  After a few text
messages about the price of the "mini draco," CANTRELL texted
"don't let him hear you talk about the guns."

22.   On January 18, 2021, between 4:48 p.m. and 5:23 p.m.,
the CS texted CANTRELL "22 was 330.  the 9 was 375.  only one
tho."  Based on my training and experience, CANTRELL was
relaying pricing for different types of firearms – that a .22
caliber pistol was $330, the 9 millimeter pistol was $375.  The
CS then sent CANTRELL two images of firearms, and CANTRELL
replied "Yes. Get it.  Get that and the 9."  Twelve minutes
later, the CS texted "i got them" and CANTRELL replied "ok."

The CS then texted "just waiting for my background" and CANTRELL
replied "ok."

23.   There were additional firearms-related communications
between CANTRELL and the CS on January 21 and January 26, 2021,
including a message from CANTRELL which stated: "Magazine for
A308 Winchester AR calibre 76 2.39."

24.   Based on ATF Form 4473s filled out and signed by the
CS and sales receipts, the CS purchased six firearms at Alliance
Loan FFL on January 22, 2021, and one additional firearm from
another FFL on January 27, 2021.   Five of those firearms were 9
millimeter pistols, and one was a Pioneer Arms (Hellpup) 762
caliber pistol.   Based on the receipts, the total purchase price
was $1,757.18.

25.   In an interview, the CS stated that on or about
January 28, 2021, after the CS and CANTRELL had purchased
firearms in Ohio, the CS helped CANTRELL package approximately
five firearms in a black Husky toolbox.   The toolbox was
subsequently padlocked, and CANTRELL maintained the key to the
padlock.

26.   The CS and CANTRELL drove to the FedEx Shipping Center
at 2670 Salt Springs Road, Youngstown, Ohio, and only the CS
went inside to ship the toolbox as directed by CANTRELL.   As
part of this process, CANTRELL instructed the CS about both the
shipping address and pricing.   Specifically, at approximately
3:16 p.m., CANTRELL texted the CS from the SUBJECT TELEPHONE a
name and address in Anaheim, California (the "Anaheim address").
The CS then provided CANTRELL with pricing for various types of

shipping, including overnight priority and ground shipping. After some discussion, CANTRELL stated that he wanted the CS to ship overnight priority for $700 but the CS stated that he/she didn't have sufficient money.  At approximately 4:12 p.m., CANTRELL texted "Priority not overnight."

27.   The CS took a photograph of the FedEx label placed on the toolbox for tracking purposes and the CS gave this photograph to investigators.  The FedEx label was addressed to the Anaheim address, and listing the CS's address in Ohio as a return address.  The ship date was listed as "28Jan21," with a tracking number of "783137027789".  The package was listed as weighing 50.85 pounds, with the following dimensions: "34 X 22 X 12 In."  The CS said the estimated arrival date for the shipped FedEx package was on or about February 3, 2021.

28.   The CS stated that after shipping the toolbox, CANTRELL stayed in Ohio for a few more days through February 2, 2021, and then departed via commercial airline from Cleveland Hopkins International Airport.  The CS dropped CANTRELL off for his flight.

C.   Reimbursement of CS for January 2021 Purchases

29.   The CS provided law enforcement with CANTRELL's username of "$Quentinc40" on the CashApp platform, which the CS used to accept payments from CANTRELL along with cash, as reimbursement for costs associated with purchasing and shipping firearms for CANTRELL.

30.   Between on or about January 18, 2021, and February 8, 2021, and individual saved in the CS's phone named "Q," made the

following five payments to the CS via CashAppp, totaling $1,220.
The CS confirmed that the individual was CANTRELL.  On February
8, 2021, CANTRELL sent a text message that said: "they haven't
even released the money yet.  I was trying to screen shot it so
you can seem [sic].  I can send 100."

D.   <u>March 2021 through April 2021 Purchases in Ohio and
Reimbursement of CS for Purchases</u>

31.   Between February 8, 2021 and April 2021, CANTRELL sent
numerous firearm-related messages to the CS.  For example, on
February 17, 2021, the CS sent CANTRELL an image, and CANTRELL
asked "How much" to which the CS responded "$599.99" and later
in the conversation stated "19 is used 625.  17 is new and 599.
300-400 and you can buy offline."  Based on my training and
experience, I understand the CS to be providing pricing for
various types of firearms.

32.   On March 1, 2021, CANTRELL texted the CS images,
followed by the following messages "these two" and "This is the
one I want."  The CS responded, "is it in alliance."  On March
2, 2021, CANTRELL texted the CS a youtube video titled "Ruger 57
Finally! First Look - Everything I Had Hoped For!" and asked the
CS to "[m]ake sure it looks like this when you go to check it
out."  On March 11, 2021, CANTRELL sent a firearm-related link
https://iwi.us/product/tavor-ts12/ and in response, the CS
replied "the glock is 599.  That's the only one that [sic]
have," to which CANTRELL responded "Ok ill pay for the
remainder."

12

33.   On March 19, 2021, CANTRELL paid the CS $200 via CashApp.  The CS has confirmed that CANTRELL also made payments in cash to cover the price of the firearms.  The CS confirmed additional payments were made by CANTRELL to the CS in cash.

34.   On March 29, 2021, CANTRELL texted the CS the address of the SUBJECT PREMISES, where CANTRELL is believed to reside, and listed the resident as A.Y.  On April 1, 2021, CANTRELL asked the CS: "Did you take care of the business, Did you send that off yet."  On April 10, 2021, CANTRELL sent the CS two different phone numbers, and told the CS to ask about firearms for sale.

35.   Based on ATF Form 4473s filled out and signed by the CS and sales receipts, the CS purchased three firearms at Alliance Loan FFL on March 18, 2021, and three additional firearms from another FFL on March 25, 2021, and April 27, 2021. Based on the receipts, the total purchase price was $1,064.97.

36.   On April 27, 2021, CANTRELL sent the CS text message stating "2 more boxes" and "I'll shoot the money tomorrow."  On April 28, 2021, CANTRELL followed up, stating "I sent 250 until I dump the other one.  But please send out tomorrow" and later in the day he said "it's all good just send out the stuff I'll send more money."  On April 29, 2021, CANTRELL texted "I sent 150 until I meet up with my boy."  Based on my training and experience, I understand CANTRELL to be stating that he will reimburse the CS once he "dumps" or "resells" the firearm stock.

37.   On April 29, 2021, CANTRELL texted the CS the Anaheim address.  In late April 2021, the CS made another shipment of an

item that was over twenty pounds to the Anaheim address, with a scheduled delivery date of May 1, 2021.  This is reflected in text messages between the CS and CANTRELL.

38.  One of the firearms purchased by the CS on March 18, 2021, a HiPoint, Model C9, 9 millimeter pistol, Serial No. P10116979, was later recovered on July 13, 2021, in Los Angeles, California.

E.   July 2021 Purchases in Ohio and Shipment to California

39.  CANTRELL visited Ohio again in July 2021.  According to the CS, during that visit, CANTRELL spoke about how he sold some of the firearms for profit in California.  In a July 8, 2021 text message, CANTRELL stated "I sent you money for both high points and tauras. Almost 800 I sent to you."  The CS recalled specific prices CANTRELL mentioned, including that a HiPoint purchased for $150 sold for $500; that a Taurus purchased for $269 sold for $750; that a Glock purchased for $500 sold for $1700; and that a Pioneer AK47 style pistol purchased for $699 sold for $3,500.

40.  According to the CS, leading up to certain straw purchases, CANTRELL would sometimes enter the store with the CS and look at or handle firearms.  Text messages from that date include the following messages from CANTRELL to the CS:  "Need you to go to Alliance" and "I need 2 tauraus."  This is corroborated in July 15, 2021 video surveillance footage from

14

the Alliance Loan FFL gun store in Ohio, showing CANTRELL
visiting the store with the CS to look at firearms to purchase:

 

    41.  Video surveillance footage from Alliance Loan FFL
showed that the CS and CANTRELL visited the store again two days
later, on July 17, 2021.



42.  The CS viewed the still photos from the FFL video footage and identified CANTRELL as the individual with him/her in the store on July 15 and July 17.  The CS and CANTRELL arrived at and departed from the store in a black GMC Acadia, that was later identified as the CS's car.



43.  Based on ATF Form 4473s filled out and signed by the CS and sales receipts, the CS purchased four firearms at Alliance Loan FFL and one additional firearm at another FFL on July 21, 2021.  Based on the receipts, the total purchase price was $957.34.  This is corroborated by a text message on July 21, 2021, from CANTRELL to the CS which states "Damn I want you to get one more high point" and "Are they gonna take you to runzo as well."  Based on my training and experience, a high point is a type of firearm and "runzo" is the name of a license firearm dealer in Ohio.  Later that day, CANTRELL stated "Can you get away from the job around 4 o'clock so I can send these off.  And

they're gonna send me the money once I've seen the tracking number."

44.   The CS stated that shortly after the purchase of five firearms in July, via FedEx, he/she shipped a container suspected to contain those firearms to an address in California that was provided by CANTRELL, later identified as the SUBJECT PREMISES, where CANTRELL is believed to reside.  The CS did not observe firearms placed in this container because CANTRELL had already packaged and locked it.  CANTRELL wrote the SUBJECT PREMISES address with a resident named M.M. on a receipt dated July 18, 2021 from a Dunkin Donuts Drive-Thru.  The CS provided the receipt to law enforcement.

F.   Identification of CANTRELL

45.   In August 2021, law enforcement conducted the following research that led to the identification of CANTRELL: (1) The telephone number of (747) 242-4625 (i.e., the SUBJECT TELEPHONE) is a cellular telephone issued by Verizon Wireless provider registered to a "Quentin Cantrell" with a subscriber address of "8200 Owensmouth Ave., Apt 1, Canoga Park, CA" (the "Owensmouth address"); (2) the California Department of Motor Vehicles ("DMV") records include an identification photo of CANTRELL, which match the individual seen in the screenshots from the FFL video surveillance; (3) California DMV records list a birthday of July 31, 1980 for CANTRELL, which matches the age and birth date details provided by the CS; (4) California DMV records list a residence of 8200 Owensmouth Ave., Apt. 1, Canoga, Park, CA (the Owensmouth address), matching the cell-

phone subscriber information;[2] and (5) a criminal history check on Quentin Cantrell shows a 2005 felony burglary conviction which matches the information provided by the CS about a prior "robbery" conviction and prohibits CANTRELL from possessing firearms or ammunition.

46.   The CS has confirmed that the individual identified in store surveillance photos is the individual he/she originally referred to as "Quentin Cardell", and for whom he/she performed these approximately sixteen straw purchases.

G.   Identification of the SUBJECT PREMISES as CANTRELL's Residence and Identification of the SUBJECT VEHICLE as CANTRELL's Car

47.   On August 10, 2021, CANTRELL texted the CS, "Send me that liquor out to day please," followed by a text message containing the SUBJECT PREMISES address.

48.   On August 18, 2021, ATF obtained a cell phone ping warrant authorizing the collection of fixed-interval GPS location information related to SUBJECT TELEPHONE.  The warrant was signed by the Honorable Carmen E. Henderson, U.S. Magistrate Judge of the Northern District of Ohio.  The results of the warrant showed the SUBJECT TELEPHONE in the Los Angeles area.

49.   During the date range of August 18, 2021, through September 3, 2021, approximately one thousand two hundred forty-nine (1,249) fixed-interval GPS records were collected detailing

---

[2] Despite the Owensmouth address being listed as CANTRELL's DMV address, based on surveillance conducted as part of this investigation, law enforcement does not believe CANTRELL to presently reside at the Owensmouth address.  Further, law enforcement databases indicate that the Owensmouth residence is currently rented by another individual who law enforcement has not found to be affiliated with CANTRELL.

the approximate location of the SUBJECT TELEPHONE.  Seven
hundred ninety-two (792) of the one thousand two hundred forty-
nine (1,249), which is approximately sixty-three percent, of the
fixed-interval GPS records occurred within approximately two and
a half miles of the SUBJECT PREMISES.

50.  The SUBJECT PREMISES is a two story, single family
residence located on the west side of Mira Mar Drive, in a gated
community.  On August 31, 2021, law enforcement conducted
surveillance at the SUBJECT PREMISES for approximately one and a
half hours, from 3:50 p.m. to 5:15 p.m., during which time
agents observed CANTRELL both exit and enter the SUBJECT
PREMISES.

51.  At approximately 5:01 p.m. on August 31, 2021, law
enforcement observed CANTRELL exit the SUBJECT PREMISES and
enter a black Nissan Rogue ("Nissan") parked in the driveway of
the SUBJECT PREMISES.  After entering the Nissan, CANTRELL
pulled out of the driveway and parked on the street.  CANTRELL
then exited the Nissan and walked back into the SUBJECT
PREMISES.  At approximately 5:08 p.m., law enforcement observed
CANTRELL exit the residence again and enter the Nissan.

52.  At approximately 7:42 a.m. on September 30, 2021, law
enforcement observed CANTRELL exit the SUBJECT PREMISES and
enter the SUBJECT VEHICLE, a black Cadillac XTA bearing
California license plate number 8VBC017, which was parked in the

driveway of the SUBJECT PREMISES, a vehicle which matches the
description of CANTRELL's car that was provided by the CS.
After entering the SUBJECT VEHICLE, CANTRELL pulled out of the
driveway and departed the residence.  At approximately 9:33 a.m.
the SUBJECT VEHICLE returned to SUBJECT PREMISES and at
approximately 9:53 a.m. an unidentified white or Hispanic
appearing female entered the front passenger's seat of the
Cadillac parked in the driveway of SUBJECT PREMISES.

53.  At approximately, 6:30 a.m. on October 7, 2021, law
enforcement observed the SUBJECT VEHICLE parked in the driveway
of the SUBJECT PREMISES.  At approximately 7:46 a.m., law
enforcement observed CANTRELL exit the SUBJECT PREMISES, enter
the SUBJECT VHEICLE and move it from the driveway to the street
in front of the SUBJECT PREMISES before returning inside.  At
approximately 10:30 a.m. an unidentified male driving a black
GMC pickup bearing Nevada license plate number 578-G90 pulled in
front of the SUBJECT PREMISES and spoke with CANTRELL.

54.  Based on my training and experience, as discussed
above, there is probable cause to believe that CANTRELL
currently resides at the SUBJECT PREMISES and drives the SUBJECT
VEHICLE.  Further, as discussed above, there is probable cause
to believe that firearms were previously shipped by CANTRELL to
the SUBJECT PREMISES.  Therefore, as discussed in greater detail
below, evidence of the Subject Offenses is likely to be found in

the SUBJECT PREMISES, the SUBJECT TELEPHONE, the SUBJECT
VEHICLE, and on CANTRELL's person.

## TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

55.   From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

a.   Persons who manufacture, possess, purchase, or
sell firearms generally maintain records of their firearm
transactions as items of value and usually keep them in their
residence or vehicles, or in places that are readily accessible,
and under their physical control, such in their digital devices.
It has been my experience that prohibited individuals who own
firearms illegally will keep the contact information of the
individual who is supplying firearms to prohibited individuals
or other individuals involved in criminal activities for future
purchases or referrals.  Such information is also kept on
digital devices on their person and in backpacks or purses in
their vicinity.

b.   Persons who manufacture, possess, purchase, or
sell firearms often keep their firearms and any associated
manufacturing equipment in their residence or vehicles, or in
places that are readily accessible, and under their physical
control.

   c. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

   d. Those who illegally manufacture, sell, or possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

e.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

56.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such file's months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they

---

[3] As used herein, the term "digital device" includes the SUBJECT TELEPHONE and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain

24

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

57.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

58.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an

enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CANTRELL's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of CANTRELL's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

59.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## GROUNDS FOR SEALING

60.  Based on my training and experience and my investigation of this matter, I believe that reasonable cause exists to seal this application and warrant.  First, the search warrant in this case has not yet been executed.  The likelihood of discovering the items sought in the search warrant would be diminished if the affidavit in support of the search warrant in this case were made publicly available before the warrant was executed.  Further, public disclosure of the warrant or the information in the warrant application could seriously jeopardize other aspects of the investigation, which is ongoing, and may result in the destruction of or tampering with evidence

beyond the scope of the warrant, endanger the life or physical safety of an individual, or cause intimidation of potential witnesses, including the confidential source.  Finally, the affidavit in support of the search warrant describes investigative techniques that may jeopardize ongoing investigations if the affidavit were to be disclosed, such as further investigation into the methods of transport of firearms from Ohio to California and identification of the purchasers of firearms in California.

61.  Thus, there is reason to believe that failing to seal the applications, affidavit, warrants, and warrant returns will result in (1) endangering the life or physical safety of an individual, (2) flight from prosecution, (3) destruction or alteration of evidence, (4) intimidation of potential witnesses, and (5) otherwise seriously jeopardizing the investigation.

## CONCLUSION

62.  For all the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm) and 18 U.S.C. § 922(a)(3) (Illegal Shipment/ Transportation of Firearms), will be found in a search of the locations described in Attachments A-1, A-2, A-3, and A-4.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 12th day of October, 2021.

_____
HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE